UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.

SOPHIE TOYA,

                Defendant.

Case No. 2:20-cr-20452

Hon. Denise Page Hood

---

## DEFENDANT SOPHIE TOYA'S MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

Defendant Sophie Toya, by and through her attorneys, respectfully requests this Court to enter a judgment of acquittal on all counts set forth in the Indictment pursuant to Federal Rule of Criminal Procedure 29 or, in the alternative, to grant her a new trial pursuant to Federal Rule of Criminal Procedure 33. In support of her motion, Dr. Toya states as follows:

1. On September 23, 2020, Dr. Toya was charged with one count of health care fraud in violation of 18 U.S.C. §§ 1347 and 2 and five counts of false statements relating to health care matters in violation of 18 U.S.C. §§ 1035(a) and 2.

2. On May 10, 2024, following a nine-day jury trial, Dr. Toya was convicted on all six counts. Each of those convictions was defective.

3.  The conviction on Count One cannot stand because there was a prejudicial variance between the facts charged in the Indictment and the evidence presented at trial in violation of Dr. Toya's rights under the Fifth and Sixth Amendments.

4.  The convictions on Counts Two through Six cannot stand because the evidence presented at trial demonstrated that it was legally impossible for Dr. Toya to have committed the charged offenses.

5.  The grounds for this motion are set forth more specifically in the accompanying brief.

6.  Pursuant to LR 7.1(a), the Government does not concur in the relief requested and opposes this motion.

Respectfully submitted,

Miller, Canfield, Paddock and Stone, P.L.C.

By:   s/Thomas W. Cranmer
      Thomas W. Cranmer (P25252)
      Gerald J. Gleeson, II (P53568)
      Phillip Shane (P72126)
      840 West Long Lake Road, Suite 150
      Troy, Michigan 48098-6358
      cranmer@millercanfield.com
      gleeson@milercanfield.com
      shane@millercanfield.com

Dated:  June 21, 2024      *Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Case No. 2:20-cr-20452

Plaintiff,

Hon. Denise Page Hood

v.

SOPHIE TOYA,

Defendant.

_____

**BRIEF IN SUPPORT OF
DEFENDANT SOPHIE TOYA'S MOTION FOR JUDGMENT
<u>OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL</u>**

**Introduction**

The prosecution told the jury in both its opening statement and closing argument against Dr. Toya that this case was all about "a doctor who lied for money." ECF No. 51, at 15; ECF No. 63, at 72. Ironically, however, the trial proved to be a master class in deception on the part of the government. First, it ran a bait and switch maneuver in which it charged Dr. Toya with one scheme and then sought to convict her for another. Then, it asked the jury to hold her responsible for allegedly false orthotics prescriptions predicated on a series of lies by undercover agents who pretended to be Medicare beneficiaries but had no connection whatsoever to any healthcare benefit program. Both of those trial strategies fatally undermined the convictions won by the government against Dr. Toya and require either the entry of a judgment of acquittal or the grant of a new trial.

The government charged Dr. Toya in Count One of the Indictment with a "scheme" to defraud Medicare – a "scheme" that allegedly involved international call centers, fraudulent telemedicine companies, kickback-paying brace suppliers, and numerous individual "accomplices," all of whom are specifically named in the indictment and repeatedly tied into Dr. Toya's alleged fraud. However, it produced no evidence of that scheme at trial. Just the opposite, every single federal agent called by the government testified that he or she had no knowledge of the details of the overall scheme or the individuals with whom Dr. Toya supposedly perpetrated it,

leaving the impression that she was operating entirely within a silo. Indeed, after confirming to the Court that it believed Dr. Toya to be part of "one grand scheme . . . that involved dozens and dozens of other parties," the government nevertheless conceded that "the scheme [it presented to the jury] is a scheme of her actions." ECF No. 59, at 8. This substantial disconnect between the facts charged in the Indictment and the evidence offered to secure a conviction at trial constitutes a prejudicial variance that confused the jury, deprived Dr. Toya of her Fifth and Sixth Amendment rights and compels the entry of a judgment of acquittal on Count One.

The government fared no better in its presentation of evidence related to Counts Two through Six, each of which charged Dr. Toya with making a false statement relating to a healthcare benefit program. The prosecution argued at trial that Dr. Toya defrauded Medicare by prescribing unnecessary orthotics for 2,651 patients over a six-month period resulting in payments of $3.3 million by Medicare. However, it based its false statement counts on only five patients over five days for whom Dr. Toya was paid a total of $125. And critically, none of those five patients was a real Medicare beneficiary. Instead, each of them was an undercover agent playing the role of a fictitious patient, and each of them admitted that everything they told Dr. Toya and her "accomplices" was a lie, including their supposed connection to Medicare or any other healthcare benefit program. Yet that nonexistent insurance coverage was the lynchpin of the government's entire case

2

because it was undisputed that every single orthotic that Dr. Toya prescribed could have been purchased off the shelf out of the patient's own pocket without any medical evaluation whatsoever. By choosing to charge Dr. Toya for making false statements to patients having no connection to Medicare in a case all about Medicare fraud, the government's entire theory of criminality was a legal impossibility, and she must be acquitted on Counts Two through Six.

## Statement of Facts

On September 23, 2020, Dr. Toya was indicted on one count of health care fraud under 18 U.S.C. §§ 1347 and 2 and five counts of false statements relating to health care matters under 18 U.S.C. §§ 1035(a) and 2. The case went to trial on April 23, 2024. The government presented twelve witnesses:

- Stephen Quindoza, a fraud investigator for Medicare;

- Tamila Miles, Brian Corcoran, and Jonelle Soeffing, undercover agents for the Department of Health and Human Services who played the role of fictitious patients;

- Roosevelt Barge, Linda Mullins, Daniel Sawyer, and Ronald Waniolek, real patients who sought orthotics from Dr. Toya;

- Dr. Sunil Lalla, a physician employed by the Medicare contractor who processed the claims submitted by Dr. Toya's alleged accomplices;

- Dr. Peter Bono, the treating physician for one of the patients who sought orthotics from Dr. Toya;

- Mary Gardocki, the FBI case agent; and

- Dr. Randy Swackhammer, a physician who worked for one of the same telemedicine companies as Dr. Toya.

The trial lasted nine days. The defense made a Rule 29 motion for judgment of acquittal at the close of the government's case and renewed that motion at the close of all the evidence. The court reserved ruling on that motion until after the jury verdict with the agreement of the parties. *See* ECF No. 62, at 3-6; ECF No. 63, at 51-52. On May 10, 2024, the jury returned a guilty verdict on all six counts.

In the Indictment, the government accused Dr. Toya of knowingly and willingly participating in an elaborate "scheme"[1] to commit health care fraud by prescribing unnecessary durable medical equipment such as back, knee, and shoulder braces for Medicare beneficiaries. The Indictment alleged that this "scheme" involved a Columbian call center known as "Procall" that recruited patients through telemarketing. ECF No. 1, at ¶ 19. It alleged that it involved two different telemedicine companies, AffordADoc Network and Integrated Support Plus, that connected the recruited patients with prescribing physicians. *See id.* at ¶¶ 19-20. It alleged that the scheme involved brace supply companies that submitted claims for orthotics to Medicare. *See id.* at ¶ 29. And it repeatedly named the owners

---

[1] The indictment uses the word "scheme" on no less than five occasions to describe Dr. Toya's alleged participation in health care fraud.

of some of these companies – including Creaghan Harry, Lester Stockett, and Willie McNeal, IV – as Dr. Toya's "accomplices"[2] in the indictment.

Over and over again, the Indictment describes Dr. Toya's alleged fraud in the context of this much larger criminal operation.[3] For example, it charged that:

- "Sophie Toya agreed with others at the AffordADoc Network and Integrated to write brace orders for Medicare beneficiaries";

- "Sophie Toya gained access to Medicare beneficiary information for thousands of Medicare beneficiaries from the AffordADoc Network, Integrated, and other purported telemedicine companies";

- "AffordADoc Network, Integrated, and others solicited illegal kickbacks and bribes from brace suppliers in exchange for brace orders that were signed by Sophie Toya";

- "Owners and operators of the AffordADoc Network and Integrated paid and caused payments to be made to Sophie Toya and others to sign brace orders"; and

- "The brace suppliers submitted and caused the submission of claims to Medicare based on the orders signed by Sophie Toya."

ECF No. 1, at ¶¶ 26-30. In other words, the Indictment made clear that Dr. Toya was a necessary, but at the same time, extremely small cog in a very large operation, and that it was impossible for her to have participated in the health care fraud charged in

---

[2] Creaghan, Stockett, and McNeal are each specifically named twice in the indictment. These individuals and the companies that they operated are collectively referred to on no less than six occasions as the "accomplices" or "others" who facilitated the "scheme" in which Dr. Toya was involved.

[3] This is consistent with the multiple press releases in which the government repeatedly described the "scheme" in which Dr. Toya was involved as one of the largest conspiracies involving durable medical equipment in the history of the United States.

Count One but for the existence of the infrastructure that her web of "accomplices" had built around her.

Yet at trial, the government offered no evidence that Dr. Toya was a knowing, willing participant in the "scheme" charged in the Indictment. In fact, none of the government's witnesses knew anything about the "scheme" or the "accomplices" who helped Dr. Toya perpetrate it. Agent after agent testified that they were basically clueless as to anything beyond the exceedingly narrow actions of Dr. Toya. For example, Special Agent Miles claimed that she didn't even know "that there was a fraud that was developed where we had call centers and the telemedicine companies and brace companies all in cahoots with one another." ECF No. 52, at 32. Special Agent Corcoran testified that he was not aware of the "nature of th[e] investigation" into the scheme and had "never heard" the name Willie McNeal. *Id*. at 85. Similarly, Dr. Lalla did not "know any of the details" of the charged scheme, and Special Agent Soeffing was not privy to the "investigation into the brace industry or ordering of braces." ECF No. 54, at 82; ECF No. 56, at 8. And amazingly, Special Agent Gardocki, the lead case agent, wasn't even assigned to the case until after Dr. Toya was indicted, was not familiar with the "day-to-day" handling of the investigation into her activities, only reviewed documents pertaining to Dr. Toya that were compiled for her by someone else, and had no knowledge as to who even submitted the Medicare claims related to Dr. Toya's prescriptions. ECF No. 59, at 89, 93, 95.

To put it simply, after indicting Dr. Toya as part of a massive fraud operation involving false claims for durable medical equipment, and despite acknowledging at trial that her alleged misconduct was part of "one grand scheme . . . that involved dozens and dozens of other parties" (ECF No. 59, at 8), the government failed to call a single agent who could testify to the overall structure of the scheme, the individuals who ran it, or how it was executed. Instead, incredibly, it actively tried to suppress that evidence through motion practice in the middle of trial and told the Court, in contradiction to the plain language of the Indictment, that "the defendant is charged with one scheme. That's Count 1 of the Indictment, and the scheme is a scheme of her own actions." *Id*. In essence, it tried a case against Dr. Toya as if she were some sort of criminal mastermind carrying out her own nefarious plans rather than allow the jury to see the full scope of the operation in which the Indictment that the Court read aloud to the jury on the first day of trial alleged she was embroiled.

If that wasn't confusing enough, the government also called a non-agent witness not mentioned in the Indictment who, like Dr. Toya, was a prescribing physician in the overall scheme. However, the testimony of that witness, Dr. Swackhammer, was extremely prejudicial as he had a much different experience than Dr. Toya. Although he admitted that the other members of the scheme "lied to [him]" and that he believed it to be a "legitimate operation" when he joined, he also testified that he came to the conclusion that he was committing fraud when he called several

patients supposedly in need of braces, and those patients told him they had "no idea" why he was calling. ECF No. 59, at 138, 140, 143. There was no evidence at trial to suggest that any patient (or anyone else) made a similar disclosure to Dr. Toya. Nevertheless, by offering up Dr. Swackhammer's erudite understanding of the scheme, the government attempted to smear her with his knowledge, a strategy that likely paid off since the jury asked for a transcript of his testimony during its deliberations. ECF No. 68, at 3.

To make matters worse, when focusing on the specific misconduct that it attributed to Dr. Toya – the issuing of false orthotics prescriptions – the government relied upon patients having no real connection to Medicare despite indicting her for Medicare fraud. In fact, none of the five "patients" giving rise to the false statement counts – Priscilla Ceron, Paul Reno, Teresa Fleisher, Gina Picarelli, and Kira Carlo – was real. Instead, each of them was played by an undercover agent who simply "pose[d] as a [Medicare] beneficiary." ECF No. 52, at 30. These agents candidly testified that they were "winging it" when they spoke with Dr. Toya just to "see[] what happen[ed]," and that "the information [they] provided was all false." ECF No. 62, at 33; ECF No. 56, at 11. In short, the agents were lying when they represented to Dr. Toya or anyone else that they were covered by Medicare or any other health benefit program.

Yet that insurance coverage was key to the false statement claims with which Dr. Toya was charged. The government told the jury in its opening statement that, "You don't need a prescription in order to get a brace. Anyone can go to a store and buy a brace for themselves." ECF No. 51, at 16. For that reason, the government repeatedly emphasized that the reason the prescriptions issued by Dr. Toya were criminal is that they made "all the difference when it comes to Medicare paying for these braces." *Id*. at 17. It was Dr. Toya's signature that "unlocked Medicare money."[4] *Id*. There can be no dispute that because none of the undercover agents who consulted with Dr. Toya was a Medicare beneficiary, it was literally impossible for a single prescription that she wrote to unlock a single Medicare dollar for any of the five patients charged in the false statement counts.

## Standard of Review

Federal Rule of Criminal Procedure 29 provides that a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In applying this rule, the Sixth Circuit has held that, "Evidence is sufficient to sustain a conviction if after viewing the evidence in the light most favorable to the prosecution, and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony, any

---

[4] That being said, she never submitted a single claim to Medicare for the braces she prescribed. See ECF No. 51, at 62.

rational trier of fact could find the elements of the crime beyond a reasonable doubt." *U.S. v. Driver*, 535 F.3d 424, 428 (6th Cir. 2008). "In examining claims of insufficient evidence, [a] court does not weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id*. at 429.

Federal Rule of Criminal Procedure 33 provides that a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that the jury's verdict was against the manifest weight of the evidence." *U.S. v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). Unlike Rule 29, this permits the court to sit as a "thirteenth juror" by "assess[ing] witness credibility" and overruling the jury's "resolution of . . . conflicting testimony." *U.S. v. Crumb*, 187 Fed. Appx. 532, 536 (6th Cir. 2006). Rule 33 also allows the grant of a new trial "where substantial legal error has occurred." *Munoz*, 605 F.3d at 373. This includes "any error of sufficient magnitude to require reversal on appeal" or any situation in which "the substantial rights of the defendant have been jeopardized." *Id*.

## Argument

A. <u>The Prejudicial Variance Between the Allegations in the Indictment and the Evidence Presented by the Government at Trial Fatally Undermines the Conviction on Count One</u>.

A grand jury indictment protects several constitutional rights of an individual charged with a crime, including the Sixth Amendment right to fair notice of the

criminal charges against which the individual will need to defend and the Fifth Amendment right to an unbiased determination of probable cause by a collection of one's fellow citizens. *See U.S. v. Combs*, 369 F.3d 925, 935 (6th Cir. 2004). The Sixth Circuit recognizes two forms of impermissible modifications to an indictment: amendments and variances. *See id*. The second variety is at issue here. A variance occurs "when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *U.S. v. Mize*, 814 F.3d 401, 409 (6th Cir. 2016). If such circumstances exist, any resulting conviction must be reversed provided that the variance "affected a substantial right of the defendant," meaning that "the defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *Id*. It is well established that a defendant may establish the existence of an impermissible variance "by referring exclusively to the evidence presented at trial." *Id*. at 410.

The Sixth Circuit has expressed particular concern about the existence of a variance where "an indictment alleges one scheme, but the evidence can reasonable be construed only as supporting a finding of multiple schemes." *U.S. v. Horton*, 847 F.2d 313, 317 (6th Cir. 1988). Thus, for example, in the *Mize* case, the Sixth Circuit reversed the conviction of three individuals who had been charged with a ten person "doctor shopping scheme" organized by Jackie Mize involving the purchase of

oxycodone from physicians in Florida for ultimate resale to drug addicts in Tennessee. In contrast to the indictment, eight of the government's eleven witnesses at trial testified about a much larger doctor shopping scheme organized by a man named Kevin Bussell. Even though the Mize scheme utilized the same methods in the same states to commit the same crimes, and even though Mize herself had learned the ropes of her doctor shopping operation from Bussell, the Sixth Circuit found that the defendants were "forced to defend against a conspiracy, i.e., the Bussell conspiracy, that was totally separate from the conspiracy charged in the indictment, i.e., the Mize conspiracy." *Mize*, 814 F.3d at 412. The Sixth Court found that this both "affected the substantial rights of all three defendants" and "seriously affected the fairness of the trial" because "the extensive proof presented by the government on the Bussell conspiracy" meant that "Defendants were found guilty of a different conspiracy from that charged in the indictment." *Id*.

The government participated in exactly such a bait and switch maneuver here, only in reverse. Instead of indicting Dr. Toya in a small scheme and then attempting to hold her responsible for her involvement in a larger one, the government went in the opposite direction. The Indictment against Dr. Toya laid out a vast web of offshore call centers, telemedicine companies, durable medical equipment suppliers, and individual accomplices who supposedly all worked together with Dr. Toya to defraud Medicare into paying for unnecessary orthotics. In furtherance of that grand

scheme, the government provided nearly 1.3 million documents in discovery, the vast majority of which pertained to these other entities and individuals and had no immediate bearing on the prescriptions written by Dr. Toya. Yet that is not the scheme that was presented at trial. Indeed, each of the government agents supposedly involved in the investigation denied having any knowledge of the broad scheme, or even the individuals named in the indictment as Dr. Toya's accomplices. That is precisely why the prosecution was forced to concede for the first time on the sixth day of trial the existence of two schemes: the original one alleged in the indictment encompassing "dozens and dozens" of dishonest companies and individual fraudsters, and the new one that it pursued at trial, which it described as a "scheme of [Dr. Toya's] own actions." ECF No. 59, at 8.

There can be no doubt that this monumental variance between the charges in the Indictment and the evidence presented at trial prejudiced Dr. Toya. Based on the allegations returned by the grand jury, Dr. Toya staked out her defense to the scheme very clearly in her opening statement. She contended that the undisputed goal of the network that recruited her was to defraud a wide range of people, and she was tricked by her so-called "accomplices" just like many other victims. As undersigned counsel told the jury: "The patients were fooled. They were fooled by the telemarketers and the TV advertisements. Medicare was fooled. They were fooled by this scheme. Indeed.com and the staffing company were fooled because nobody told them about

this scheme, and the last person, and most importantly, that was fooled was Dr. Toya." ECF No. 51, at 29.

Critically, the far-reaching formulation of the scheme in the Indictment was essential to the presentation of this defense. A person obviously cannot trick themselves into a scheme of one. However, as defense counsel emphasized to the jury at the outset, "Being duped, being sucked into a scheme when you don't know it's a scheme, that's not knowingly, intentionally and willfully participating in Medicare fraud." *Id*. at 35. Accordingly, because it expected the government to put on evidence of the scheme charged in the Indictment, the defense urged the jury at the very beginning of the case to stay focused on distinguishing between "the real persons who are involved in this fraud, who were part of the scheme, and who were the victims of this." *Id*. at 37.

Had the government stuck with the scheme charged in the Indictment and offered witnesses who had knowledge of how it operated, Dr. Toya would have been able to make good on this distinction through cross-examination of the government's own witnesses. More specifically, had the government called the agents who were actually familiar with the investigation and the "accomplices" who supposedly plotted with Dr. Toya to defraud Medicare, she could have elicited a wide array of exculpatory testimony, including but not limited to that: (1) she did not know, let alone conspire with, the architects of the scheme; (2) the companies and individuals

who orchestrated the scheme made every effort to promote it as legitimate; (3) far from telling the participating physicians of any illegality, they lied to the participating physicians to hide the fraud.[5]  However, by pivoting to a case where Dr. Toya was supposedly operating in a silo, a case where she was simply running a "scheme of her own actions," a case where the investigating agents knew about nothing other than the myopic prescriptions that she wrote, the government pulled the rug out from under the defense and significantly compromised her ability to blame the true culprits.

Instead, the evidence that the government ultimately presented to the jury more closely resembled a malpractice case in which the government improperly stood in the shoes of Medicare beneficiaries and tried to prove that Dr. Toya was a bad doctor guilty of exercising poor medical judgment.  For example, many of the proofs focused on how she didn't spend enough time with the patients, didn't verify the accuracy of their medical histories, and didn't consider alternative treatment options.  By misdirecting the jury's focus to Dr. Toya's purportedly poor clinical judgment, the government blunted its need to prove (which it couldn't) that Dr. Toya

---

[5] The defense was able to offer some of this testimony in the presentation of its own case after the government rested.  For example, Special Agent Marc Vanzetta testified that Herb Kimble, one of the principal architects of the scheme who ended up cooperating with the government, gave up "dozens" of names but never once identified Dr. Toya as one of his co-conspirators.  ECF No. 62, at 116-117.  In addition, Willie McNeal, who was alleged to be one of Dr. Toya's "accomplices" in the Indictment, testified that he never told her of the illegal nature of the operation.  *Id*. at 47. Just the opposite, he invested substantial effort to make the scheme look "legitimate" to the staffing companies he used to recruit her.  *Id*. at 33-34.

knowingly and willingly participated with her alleged "accomplices" in the elaborate international Medicare fraud scheme charged in the Indictment.

If the government really wanted to try such a narrow case, it should have indicted Dr. Toya that way from the beginning so that she could have formulated an appropriate defense strategy to address it. Had the government charged that case in the Indictment rather than an international fraud scheme, the defense could have bolstered Dr. Toya's medical decisions through the presentation of expert testimony and other standard-of-care-based evidence. However, by charging her with being a knowing, intentional fraudster in a scheme of dozens and dozens of other parties and then trying her for a supposed scheme of one with proofs sounding in malpractice, the government eviscerated the fundamental fairness of the trial. It deprived Dr. Toya of adequate notice of her alleged misconduct and irreparably prejudiced her ability to defend herself against a case which she never saw coming.

B. <u>It Was Legally Impossible for Dr. Toya to Have Committed the False Statement Offenses Charged in Counts Two through Six of the Indictment Because the Fake Patients on Which the Government Predicates Those Charges Had No Connection to Any Health Benefit Program</u>.

The doctrine of legal impossibility prohibits a defendant from being convicted for an act that does not amount to a crime, even if the defendant intended to commit a crime in undertaking that act. *See U.S. v. Peete*, 919 F2d 1168, 1176 (6th Cir. 1990) ("Legal impossibility is commonly defined as the case in which the defendant did everything he intended to do but yet had not committed the completed crime."). For

example, an individual could not be prosecuted under the Hobbs Act for making a "lawful campaign contribution to a United States Senate candidate" even though he "incorrectly believes the contribution is illegal." *Id*. The rationale underlying the doctrine is that bad intentions are not a crime. If an act is legal, the subjective purpose of the individual who performs it simply does not matter.

Admittedly, the doctrine of legal impossibility has limited application in the Sixth Circuit. For example, it is not a defense to the crimes of conspiracy or attempt because, in those circumstances, the subjective intent of the defendant is precisely what is made illegal. *See U.S. v. Yang*, 281 F.3d 534, 543-44 (6th Cir. 2002). The key element of a conspiracy charge, for example, is "a mutual understanding to try to accomplish a common and unlawful plan." *Id*. at 544. "[W]hether the object of the scheme actually is, as the parties believe it to be, unlawful is irrelevant" because it is the act of coming to an illicit agreement, and not the actual carrying out of the target offense, that constitutes the core of the crime. *Id*. Similarly, the key element of an attempt charge is "the intent to engage in criminal activity" coupled only with an overt act toward the fulfillment of that purpose. *Id*. at 543. Legal impossibility is no defense to such a charge because it simply does not matter whether the underlying crime is ever completed. It is the ill-intentioned effort that constitutes the offense.

Despite these limitations, the doctrine of legal impossibility has been invoked on several occasions by the Sixth Circuit, including in the context of false statement charges. For example, in *U.S. v. Hixon*, 987 F.2d 1261 (6th Cir. 1993), the defendant was charged with making a false and material statement in violation of 18 U.S.C. § 1001 in connection with claims he submitted for ongoing disability compensation. The government alleged that he falsely stated on applications that he was not self-employed when, in fact, he served as the president and sole shareholder of a consulting company. When confronted by agents about this fact, the defendant "broke down [and] cried" and admitted that "I've been employed since day one." *Id*. at 1264. However, the Sixth Circuit determined that the defendant's consulting work did not constitute self-employment as a matter of law because the company for which he performed it was "a distinct legal entity" in good standing with the state. *Id*. at 1266. Accordingly, even though the defendant intended to make false representations regarding his employment status in connection with his claim for disability benefits, the Sixth Circuit determined that it was legally impossible for him to have violated the false statements statute because his "representation that he was not self-employed was, on its face, not a false representation." *Id*. at 1267.

The Sixth Circuit has also applied the doctrine of legal impossibility in cases involving undercover sting operations. For example, in *United States v. Monasterski*, 567 F.2d 677 (6th Cir. 1977), the court reversed the defendant's

conviction for possession of stolen goods in violation of 18 U.S.C. § 659 where the goods in question – tires – were recovered by the owner through the intervention of law enforcement before the delivery to the defendant occurred. Specifically, the teenagers who stole the tires were apprehended "within hours" of taking them from a Conrail boxcar. *Id.* at 678. The FBI was subsequently called to the scene and "talked the three young thieves into following through on their intended disposition of the tires" because it was "[d]esirous of catching the intended outlet." *Id.* The FBI then followed the trail of deliveries until the tires came into the possession of the defendant. Although the government complained that reversing his conviction would "punish[] efficient police work," the Sixth Circuit disagreed, explaining: "It is one of the most fundamental postulates of our criminal justice system that conviction can result only from a violation of clearly defined standards of conduct." *Id.* at 683. The court then held that it was legally impossible for the defendant to have violated those standards in connection with the charged offense because "the goods lost their stolen character" due to the intervention of the FBI. *Id.* at 681.

The result should be no different here. At the outset, it is important to note that the government did <u>not</u> charge Dr. Toya with either conspiracy or attempt in connection with her prescribing activity. Instead, in Counts Two through Six of the Indictment, it charged her with the substantive offense of making false statements, and it predicated that offense *exclusively* on the work of undercover agents who

repeatedly lied to Dr. Toya and her alleged accomplices. Critically, one of the key lies told by those agents is that they were Medicare beneficiaries. There is no dispute that they were not. None of the so-called "patients" giving rise to the false statement charges were covered by Medicare, and no health insurance program was going to pay any claims for the braces that she prescribed. This fact is fatal to the false statement charges because, as this Court instructed the jury, in order to convict Dr. Toya of that offense, the government had to prove that she issued a false prescription "in connection with the delivery of or payment for any healthcare benefits, items or services involving a healthcare benefit program."[6] ECF No. 63, at 137.

The government tried to muddy this fact for the jury, telling them during its opening statement that these five statements were simply "examples of the much larger fraud scheme" and arguing again in its closing that "there are way more than five lies." ECF No. 51, at 20; ECF No. 63, at 76. In so doing, it invited further confusion among the jurors by encouraging them to believe that the specific false statements charged in the Indictment did not matter, and Dr. Toya could be convicted based upon any misrepresentation that the jury may have believed she made. But that wasn't (and isn't) the case. The Indictment charged Dr. Toya with five specific

---

[6] The term "healthcare benefit program" was defined by the Court to mean "any public or private plan affecting interstate commerce under which any medical benefit, item or service is provided to any individual." ECF No. 63, at 138.

counts of making false statements on five specific dates based on five specific interactions with five specific patients, and the government chose the five.

Regardless of what the government argued at trial about what Dr. Toya did or didn't intend or what she did or didn't believe in writing the orthotics prescriptions, the fact remains that none of the prescriptions in the five false statement counts were objectively connected to any healthcare benefit program in the real world. Just like the tires in *Monasterski* weren't actually stolen or the disability beneficiary in *Hixon* wasn't, in fact, self-employed, the prescriptions written by Dr. Toya in these five instances did not, in reality, involve an authentic insurance claim. And this shortcoming was absolutely critical to the government's case because the prosecution conceded that it was only the involvement of a healthcare benefit program like Medicare that transformed Dr. Toya's conduct into a crime. Any one of Dr. Toya's patients could have purchased any of the braces that she prescribed over the counter with money from their own pockets. Without an actual Medicare beneficiary, there was no offense.

In its closing argument, the government asked the jury to consider whether Dr. Toya "lie[d] for money or was she fooled?" ECF No. 63, at 77. With respect to Counts Two through Six, she was fooled by the government. And the manner in which the FBI and HHS manipulated her made it legally impossible for her to have committed the charged crimes. By choosing to indict her for issuing prescriptions

to five fake patients rather than any of the thousands of real Medicare beneficiaries at the heart of the alleged scheme, the government put on evidence of conduct that wasn't illegal. The only possible verdict for the false statement counts is acquittal.

## Conclusion

For the reasons stated, none of the government's charges were proven at trial. Dr. Toya must be acquitted on all counts or, in the alternative, granted a new trial free of the errors that led to her wrongful conviction in this one.

Respectfully submitted,

Miller, Canfield, Paddock and Stone, P.L.C.

By: _s/Thomas W. Cranmer_____
  Thomas W. Cranmer (P25252)
  Gerald J. Gleeson, II (P53568)
  Phillip Shane (P72126)
  840 West Long Lake Road, Suite 150
  Troy, Michigan 48098-6358
  cranmer@millercanfield.com
  gleeson@milercanfield.com
  shane@millercanfield.com
Dated: June 21, 2024   *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2024, I electronically filed the foregoing paper with the Clerk of the court using the ECF system which will send notification of such filing to all counsel of record.

By:   s/Thomas W. Cranmer
      Miller, Canfield, Paddock and Stone, P.L.C.
      840 West Long Lake Road, Suite 150
      Troy, MI  48098-6358
      Telephone: (248) 267-3381
      E-mail: cranmer@millercanfield.com

42221976.4/159768.00001